PANTAZE COMPANY, INC. v. DAISY P. CHISM.

Western Section.   December 17, 1930.

Petition for Certiorari denied by Supreme Court, May 2, 1931.

E. B. Klewer, of Memphis, for plaintiff in error.

Earl King and W. W. Swift, both of Memphis, for defendant in error.

WARDLAW STEELE, Sp. J.  This is an appeal in the nature of a writ of error by the plaintiff in error, Pantaze Company, who will hereinafter be referred to as the defendant, from the verdict and a judgment rendered thereon, in favor of the defendant in error, Mrs. Daisy P. Chism, who will hereinafter be referred to as plaintiff, for personal injuries sustained by her in a fall on the defendant's premises.

The defendant was the lessee of a building situated at the southeast intersection of Main Street and Madison Avenue in the city of Memphis. The defendant had sublet a part of the basement of said building for use as a barber shop and another part of the basement for use as a shoe shop. A stairway led into the basement rooms from the sidewalk, the shoe shop being on one side of the stairway and the barber shop on the other side.

On or about May 19, 1928, the plaintiff had occasion to use this stairway in going to the shoe shop for the purpose of having some shoes repaired; as she neared the bottom of said stairway she received a violent fall upon one of the steps which was at the time

and place, broken, wobbly, and unsteady, and as a result sustained serious, painful, and severe injuries.

Plaintiff sued for $15,000 damages and the verdict of the jury was for $5,000.

A motion for a new trial was seasonably made by the defendant and was overruled and the defendant has appealed to this court and assigned four errors.

These assignments are (1) that the trial court erred in overruling defendant's motion for a new trial to the effect that the verdict of the jury was so grossly excessive as to evince such passion, prejudice, and caprice that the verdict should have been set aside altogether and a new trial awarded, and (2) that the trial court erred in overruling the defendant's motion for a new trial to the effect that the verdict of the jury was excessive and in approving the verdict of the jury for $5,000 damages, and (3) that the trial judge erred in not awarding a new trial or in not suggesting a substantial remittitur, and (4) the trial judge erred in overruling defendant's motion for a new trial to the effect that the verdict of the jury was the result of passion, prejudice, and caprice.

We shall consider and dispose of all of the assignments of error together.

It appears from the proof that as a result of the fall, the plaintiff sustained a sacroiliac slip and sprain. It is conceded by counsel for plaintiff in error that the proof warranted the jury in finding that the plaintiff sustained a sacroiliac slip.

Dr. Burns, the physician who attended the plaintiff described her injuries as follows:

"Q. What condition did you find, doctor? A. I found Mrs. Chism's back pretty severely strained or sprained, I would.. say, with very great bruising on her hip and on her back—a large black area, complaining also of her shoulder.

"Q. What about the lower region, Doctor, what did you find, did you find anything in her sacroiliac region? A. From the examination, I determined that she had a sacroiliac slip. I had to put her on the table to make certain movements to establish that.

"Q. Doctor will you explain to the jury in ordinary words just what a sacroiliac slip is—the two bones, and so forth? A. Well, the pelvis is the bottom of the trunk and it comes together in front here just above what they call the mons veneris or hair, at that point and then behind it. The sacrum comes between those two bones and is a fixed joint ordinarily. This may be jarred loose and make a slip—one side or the other slip and I discovered she had a sacroiliac slip by the movement by raising the leg and extending the leg upon the thigh and carrying it up as high as you can, it will

produce great pain in the back—low back pains. This was quite definite and incapacitated Mrs. Chism for some time.

"Q. Doctor is a sacroiliac slip or a sacroiliac sprain a matter of serious moment to the health of a person or is it a matter of temporary disability? A. It is a very painful thing, lasting for a few days, in some cases, others for weeks and months.

"Q. Doctor, does the profession know much or little about the treatment which results in a cure, or is it a matter of more or less indifferent success with the profession? A. The treatment of it is very unsatisfactory. You see you have got a big bone—you are carrying your weight on it, it slips up and down—it is pretty hard to fix. The only thing that will fix it permanently is to do an open operation on it and take a piece of bone out of some other bone and lay it cross ways in the trench and let it grow that way. In that way you can prevent it slipping. That is a great big operation and is not very often resorted to.

"Q. Doctor, have you seen Mrs. Chism since the time you made this examination and determined she had this sacroiliac slip or lesion? A. Yes, I saw Mrs. Chism right frequently at the house and at the office, not so frequently at the house but at the office later and I have seen her from time to time recently that is, in the last six months and more often prior to that time, and then she has called me on the telephone and I have instructed her about her treatment.

"Q. What, at the times that you have seen her was her condition—one of intense pain and suffering or otherwise? A. She was evidently suffering pain.

"Q. Doctor did you prescribe any braces or appliances for her? A. Yes, I prescribed a hip, tight fitting, tightly laced corset for the pelvis.

"Q. Doctor, the pelvis consists of the bone just before you come down to the leg bones? A. It is the bottom of the trunk.

"Q. It carried also your abdomen? A. It supports the trunk and the upper extremities and the head, by reason of—by means of the thigh bones which go in with a head like that on each side and hold it up. It is particularly a part of the boney system.

"Q. Doctor, what are some of the things that could and do ordinarily cause a sacroiliac slip or lesion? A. Oh, injuries such as Mrs. Chism had, falls and sometimes from stooping over, getting overbalanced, it sometimes slips out. Those who have these sacroiliac slips habitually are the ones that have had it at sometime and it has not been cured and it slips in and out—slips out when they stoop over, and those patients are ill at ease and very frequently have a relapse or have a reslip and it incapacitates them again for some days or some weeks."

It also appears that the plaintiff was up and down for the entire summer after the accident and at the time of the trial two years later she was still suffering from the injuries which she sustained. That she was rendered highly nervous and that before the accident her blood pressure was normal and since the accident that it has been unusually high. And that since the accident she has suffered from insomnia which she had never had prior to the accident.

It also appears that the plaintiff has from time to time suffered much pain on account of the injuries. And with reference to her recovery Dr. Burns testified that she still complains and that she complains of her back and nervousness and inability to sleep and that at the time of the trial she had not entirely recovered from the injury which she received.

The plaintiff described the injuries she received as follows:

"Q. What injuries did you receive in the fall? Just describe them. A. Well my left foot was sprained and badly bruised from hitting the wall. I fell on my right hip and sustained a bruise that you couldn't cover with your two hands, and my back hit the step above there to the back, the part up here, and the fore arm, I threw this hand out trying to catch, and this forearm was all bruised from my wrist to my elbow, painfully bruised; it was not broken.

"Q. The places that you mentioned on your right hip and elbow, were they discolored? A. I should say so, black as tar.

"Q. What is that? A. Black as tar.

"Q. Black as tar? A. Yes.

"Q. How long did they remain that way? A. Well, for months, it takes a good while for bruises like that to disappear."

She also testified that prior to the accident she was robust and healthy and could do anything that she wanted to and that since the accident she was very much incapacitated and could not stay up all day at the time of the trial without taking a rest at least twice a day. That the doctor prescribed a tight fitting corset for her to wear and that it was still necessary at the time of the trial for her to continue to wear it and that if she left it off that her back still pained her to such an extent that she could not stand to go without it.

There is other proof in the record tending to show the severe injuries sustained by the plaintiff by reason of the accident.

We are of the opinion from the testimony of the physician and other testimony in the record that as a result of this accident the plaintiff received injuries from which she is likely to suffer more or less during the balance of her life.

Counsel for defendant and also counsel for plaintiff have cited and referred to several cases from other jurisdictions with reference

to the amount of the verdicts approved in cases involving injuries to the sacroiliac joint.

In some of the cases referred to, verdicts were approved for an amount in excess of the verdict in this case and in other cases referred to, verdicts were approved for amounts less than the verdict in the instant case. In cases of this kind the amount of the damages necessarily must be determined from the testimony of all the witnesses and the circumstances proven on the trial of the case and there is no uniform rule which can be followed in a case of personal injuries for the determination of the amount of damages.

In a case of personal injuries the question of damages is peculiarly within the province of the jury and it is the duty of the jury to determine the amount of compensatory damages to which the plaintiff is entitled under all of the facts and circumstances of the case.

From the testimony of the record we are satisfied that the plaintiff sustained very severe injuries from which she has suffered and will continue to suffer and we think that the jury from the testimony was well warranted in fixing the amount of damages at $5,000.

We find nothing in the record to indicate that the verdict of the jury was dishonest or that the amount of the verdict shows prejudice and sympathy upon the part of the jury.

We are of the opinion, that where the jury saw the plaintiff and heard all of the testimony and that since the verdict of the jury has been approved by the trial judge, who likewise heard all the evidence and considered the motion for a new trial upon the ground that the verdict was excessive, that the verdict should not be disturbed by this court.

As said by the Supreme Court in the case of Reeves v. Catignani, 157 Tenn., 176, 72 S. W. (2d), 38:

"The amount of the verdict is primarily for the jury to determine and next to the jury the most competent person to pass upon the matter is the judge who presided at the trial and heard the evidence."

We are content to abide the verdict of the jury and the decision of the learned trial judge who saw the witnesses and heard their testimony and were of the opinion that $5,000 was the sum which met the ends of justice in this case.

All of the assignments of error are accordingly overruled and the judgment of the lower court is in all things affirmed. The plaintiff in error and its surety upon the appeal bond will be taxed with the costs of appeal.

Senter and Heiskell, JJ., concur.